FOURNET, Justice.
 

 Leander H. Perez, as the District Attorney of the Twenty-fifth Judicial District of Louisiana, upon the written request of citizens and taxpayers of the said district, instituted these proceedings to have J. Claude Meraux removed from his office as judge of the district under the provisions of Section 5 of Article IX of the Constitution of 1921, on charges of high crimes and misdemeanors in office, incompetency, corruption, favoritism, extortion, oppression in office, and gross misconduct.
 

 The petition is lengthy, comprising some 46 printed pages, the allegations of which, for convenience in disposing of the case, may be grouped into three categories. They charge the defendant with (1) corruption, misconduct, and extortion in office — based on the allegation contained in Article V of the petition that Judge Meraux, through the approval of fake bills for grand and petit
 
 *503
 
 jury expenses, manipulated the payment of his personal purchases at the store of L. T. Fontenelle by the Police jrgy of Plaque-mines Parish; (2) favoritism, oppression, incompetence, malfeasance, non-feasance, and misdemeanors in office — based on the allegations contained in Articles VI through XXXI (with the exception of those contained in Article XXIX, which have been abandoned), which have reference to his handling of certain criminal and political cases, including the sentencing of convicted persons, the illegal suspension of sentences and release of prisoners, his treatment of persons charged with crimes, the unlawful trial of cases involving voters of the district without a jury, the absenting of himself to delay action in election cases in order to favor the candidates supported by his political party, and his failure to recuse himself in cases where he was required to do so by law; and (3) malfeasance and incompetency in the handling of civil cases —based on the allegations to be found in Article XXX in support of the charge that Judge Meraux operated a “divorce and annulment racket,” as evidenced by a hundred specifically enumerated cases.
 

 The judge first interposed exceptions of no cause and no right of action, as well as a motion to strike from the petition those allegations having reference to his actions prior to his election to his present term of office in 1936, which were overruled by this court. See 195 La. 987, 197 So. 683.
 

 On the merits the defendant answered denying that the suit was brought on the request of citizens and taxpayers of St. Bernard and Plaquemines parishes and averring that the same was both instigated and instituted by Leander H. Perez for purely political reasons.
 

 Answering the allegations of Article V, Judge Meraux admitted “that he had an open account” with the L. T. Fontenelle store but declared “to the Court that this account was paid from time to time and that he owed L. T. Fontenelle nothing for any goods purchased in either 1937, 1938 or 1939, * * * and that all goods bought by him were paid for out of his own money.” Further answering the allegations of this paragraph, the defendant averred that if he signed any vouchers for L. T. Fontenelle, he did so in accordance with a custom that the judge should approve all bills presented to him by the sheriff or his deputy for the payment of expenses incurred in connection with the grand and petit juries and with the belief that such bills would not be paid unless and until approved by the district attorney; that he relied entirely on his faith in the integrity and honesty of the deputy sheriff and jailer, as well as on that of the district attorney, for the authenticity arid legitimacy of these bills; and that he had not authorized the use of the proceeds of such vouchers or checks for the liquidation of his personal accounts. Still further answering this paragraph, the defendant re-urged that the same should be stricken from the petition because the duty imposed upon him to approve such bills did not fall into any of the categories of his judicial duties or functions.
 

 The basic allegations of the next twenty-five articles (VI through XXXI) are categorically denied in the answer, with the
 
 *505
 
 specific averment that his acts which form the basis of the charges against him with reference to his handling of criminal cases were all done in the presence of and with the consent and acquiescence of the district attorney. In the cases where the defendants pleaded guilty and sentences were nevertheless deferred (not having been imposed by him up to the time this suit was filed), Ke alleged that his failure of duty in these cases was due entirely to the district attorney’s failure to again call the matters to his (Meraux’s) attention by re-fixing them for sentence. The same is alleged to be true with reference to the cases where motions for new trials had not been disposed of when this suit was filed. Judge Meraux denied having absented himself to delay action in election cases in order to favor candidates supported by his political party, averring instead that the litigants did not want him to handle these cases and consequently made no effort to contact him, for he was not only available at all times, but was also ready and willing to hear the cases. He also denied the allegations with respect to his unlawful trial of cases involving voting rights in his district and his failure to recuse himself in proper cases.
 

 In answer to Article XXXII of the petition for his removal, Judge Meraux denied he had ever unlawfully or in collusion with anyone rendered any illegal divorce or annulment judgments or that he had permitted, with his knowledge, the use of his court for such unlawful purposes.
 

 The defendant in his answer and by objecting to the introduction of evidence during the trial of this case, questioned the validity of the charges filed against him and having reference to his actions prior to his present term of office, but he has apparently abandoned this contention for his counsel have not urged the same in their argument, either orally or in brief. Moreover, we might add that this question was. resolved adversely to defendant’s contention when the issue was squarely passed upon by this court in disposing of the defendant’s motion to strike. See 195 La. 987, 197 So. 683. See, also, State v. Lazarus, 39 La. Ann. 142, 1 So. 361; State v. Bourgeois, 45 La.Ann. 1350, 14 So. 28; and Stanley v. Jones, 197 La. 627, 2 So.2d 45.
 

 We agree with the Commissioner in this case that the evidence tending to show this suit was brought by politicians actuated by political motives' or interests is irrelevant and can have no bearing in this case unless it be for consideration in testing the credibility of witnesses testifying with respect to matters pertinent to the issues raised in the case, for the Constitution of 1921 declares that “For any of the causes specified in Section 1 hereof (high crimes and misdemeanors in office, incompetency, corruption, favoritism, extortion, or oppression in office, or for gross misconduct, or habitual drunkenness), the judges of the courts of record may be removed by judgment of the Supreme Court * * *. Such suits may be instituted by the * * * district attorney, in his discretion, and he shall do so when requested in writing by * * * twenty-five citizens and taxpayers * * * residing within the district from which any judge was elected.” Section 5 of Article IX. (Brackets ours.)
 

 
 *507
 
 In support of the charge that the defendant utilized the functions of his office to obtain money from the Plaquemines Parish Police Jury for the payment of his personal account by the approval of fake bills for meals and refreshments (allegedly furnished to the grand and petit juries by L. T. Fontenelle) under authority of Article
 
 677
 
 of the Code of Criminal Procedure (Section 1042 of the Revised Statutes and Section 1 of Act No. 16 of 1884), the record reveals that Judge Meraux from time to time during the years 1937 and 1938 made purchases from the general merchandise store and saloon, located near the court house at Pointe-a-3a-Hache, Louisiana, in Plaquemines Parish, which store and saloon is owned and operated by L. T. Fontenelle, the deputy sheriff of the parish who acted as court crier when Judge Meraux held court there. Fontenelle testified at length and in great detail as to just how these purchases were handled and paid. He stated that some time during the middle of 1937, after he talked with Meraux about paying his bill at the store, Meraux, advising him that he had to get his expense money for traveling to Pointe-a-la-Hache to hold court, instructed Fontenelle to “make the bills out to the, Police Jury for meals and ’refreshments furnished to the Grand and Petit Juries and I will approve them and you will credit my account with the check you get.” This arrangement continued until the latter part of 1938, at which time the President of the Police Jury of Plaque-mines Parish, Mr. Robert S. Leovy, became suspicious when he noticed that on the days on which these meals and refreshments were allegedly being furnished to the grand and petit juries, neither jury had been in session and that in most instances when the juries were in session their meals were furnished by a Mrs. Elliott Hingle. He therefore advised Fontenelle that such bills would no longer be honored by the Police Jury. When Judge Meraux thereafter sought to make additional purchases at the Fontenelle' store, he was advised of the action taken by Mr. Leovy and the Police Jury.
 

 Fontenelle’s son, Herman, a clerk in his father’s store, substantially corroborated his father’s testimony that the goods furnished Judge Meraux were for his personal use and benefit and that the same were paid for in the manner outlined by his father and that no meals or refreshments were ever furnished to the grand or petit juries as reflected by the statements approved by the judge. In explaining why the use of this scheme was employed to pay the defendant’s account, he stated that “ * * * Judge Meraux ordered my father, in my presence to make the bills to the Police Jury for lunch and refreshments, as he wanted the Parish to pay the bills, as he said he had to get the expense money he paid to come down to Court.”
 

 In further corroboration, the Clerk of Court, Mr. Allen L. Lobrano, testified from the minute book of the court showing that neither the grand nor petit juries had met on the days on which the meals and refreshments were allegedly furnished, as reflected by the statements approved by Judge Meraux in Fontenelle’s favor, except on three occasions and that in those three
 
 *509
 
 instances the meals were furnished by Mrs. Elliott Hingle, she being duly reimbursed therefor when statements to that effect were approved by the district judge (Meraux), and presented to the Police Jury.
 

 Robert S. Leovy, the President of the Plaquemines Parish Police Jury, in his testimony, corroborates Fontenelle with respect to the conversation in which he advised Fontenelle no further bills would be honoréd by the Police Jury for the furnishing of meals and refreshments by the Fontenelle store.
 

 The statements prepared by Fontenelle and approved by Meraux, as well as the vouchers of the Police Jury in payment thereof, were all introduced in evidence. In addition, Fontenelle’s books were introduced in evidence showing that Judge Meraux’s account was credited with several amounts received from the Police Jury in this manner.
 

 On direct examination Judge Meraux testified that he seldom made any purchases from the Fontenelle store on credit, most of his purchases being for cash, and that his account at the Fontenelle store did not at any time exceed $25 or $30. He denied the purchase of many of the articles that appeared to have been charged to him on the ledger of the Fontenelle store, such as whiskey, a polo shirt, and work pants. In most instances he questioned the quantity of the purchases with which he was charged. For example, he questioned the correctness of the account with respect to gasoline purchases, particularly when the purchases amounted to as much as 14 gallons, it being his contention that the capacity of the tank on his car was 12 gallons and, in addition, that he had never purchased more than 5 or 6 gallons at a time. He also denied having purchased the large number of shoes charged to him. When questioned with respect to his approval of the statements presented to him by Fontenelle for meals and refreshments for the grand and petit juries, he declared that because of his implicit confidence in the integrity of Fontenelle, who had been for many years deputy sheriff and crier of his court, he believed Fontenelle when he indicated, in presenting these bills for his approval late in the afternoon, that he had not at that time had a chance to figure up just how much was due him for the meals and refreshments served and that he consequently signed these statements in blank with the understanding that Fontenelle would figure out the amounts later and enter them correctly. His explanation of what these amounts were intended to cover is as follows:
 
 “It was the custom in the Parish of St. Bernard and the Parish of Plaquemines,
 
 ever since I was elected Judge in 1924, and a custom that I inherited from my predecessor Leander H. Perez,
 
 in the afternoon session, we always served refreshments, drinks, cigars and so forth and those things were paid for by .the Police Jury
 
 * * On cross-examination he further stated: “As I said, Fontenelle would ask me to sign them (statements) in blank and did not tell me what they were for, and I thought they were legitimate payments (claims) that the Parish owed him. * * *
 
 I did not see
 
 
 *511
 

 those bills or the amounts they were made ■out for, until I saw them in this Court
 
 Room" (Italics and brackets ours.)
 

 Counsel for defendant argue that the plaintiff has failed to prove the charge made in Article V of the petition with that degree of certainty required by the law in cases where a judge is sought to be removed, contending that while such cases are civil in fact, they are criminal in nature, necessitating the same degree of proof as in criminal cases, that is, beyond .a reasonable doubt, stress being laid on the fact that this is particularly true in so far .as the allegations of Article V are concerned, since they, in effect, charge the defendant with the commission of a crime, either the obtaining of money by false pretenses or by means of a confidence game.
 

 It is declared in Corpus Juris that “While, in some jurisdictions, it has been held that proceedings for the removal of certain judges under statutory provisions are not criminal in their nature, but are considered special proceedings, ordinarily an
 
 impeachment
 
 proceeding is of a judicial and criminal nature and is governed by the rules applicable to criminal cases.” Vol. 33, Section 47, at page 945. (Italics ours.) However, this is not a suit for the impeachment of a public officer under the provisions of Section 2 of Article IX of the Constitution of 1921, which is instituted and tried in our legislative branch of government and carries with it the penalty, in the event of conviction, not only of the removal of the public officer, but also debars “the accused from holding any office under the State,” and, in the case of a judge so convicted, disqualifies him from practicing law. This is simply a suit for the removal of a district judge instituted under the provisions of Section 5 of Article IX of the Constitution of 1921 authorizing the removal of judges of courts of record for any of the causes specified in Section 1 of the same article. This section not only vests the Supreme Court with original jurisdiction for the trial of such cases, but also gives this court the authority to “make such rules for the speedy and economical trial thereof as it deems proper.”
 

 In criminal cases the rules of evidence in this state are statutory, while in civil cases they are not restricted generally by statutory law, the measure of proof in any particular case depending principally upon its nature. For example, in cases involving ordinary money judgments, only a fair preponderance of the evidence is required to establish the claim, while our coúrts universally require more than a fair preponderance of the evidence in cases where fraud is involved.
 

 We have not been favored with any authorities from our jurisprudence dealing with this special subject matter and we have been unable to find any. However, in a recent disbarment proceeding we said that the evidence introduced to sustain a charge of gross misconduct on the part of the attorney must be clear and convincing, assigning as our reason therefor that proceedings of this nature are not instituted with the primary object of punishing the man, but, instead, for the purpose of preserving the integrity of the courts. See
 
 *513
 
 In Re Novo, 200 La. 833, 9 So.2d 201, handed down May 25, 1942.
 

 It is our opinion, that while the removal of a district judge under Section 5 of Article IX of the Constitution of 1921 does not necessarily bring upon him the disgrace and dishonor attendant in impeachment and disbarment proceedings, such a proceeding does, nevertheless, deprive him of his office and the emoluments thereof and will, unquestionably, affect his standing in the community as well as the practicing of his profession. In view of these facts, we do not feel that we would be justified in imposing such a penalty on one holding the office of judge unless the charges brought against him are supported by clear and convincing evidence.
 

 Counsel for defendant argue that in this instance the Fontenelles are “self-confessed culprits”, having admitted their own fraud, and, further, that the testimony of the son, Herman, cannot be used to corroborate that of the father, because the son was an accomplice in perpetrating the fraud. It is their contention that the scheme was concocted solely by the Fontenelles for their own profit and benefit, and was carried out by their taking advantage of an easy-going, good-natured judge who reposed confidence in the elder Fontenelle. Counsel stress the fact that the testimony in connection with this charge is resolved finally into the “ * * * sole question of veracity between the two Fontenelles, father and son, on the one hand, and Judge Meraux on the other hand. * * Unless the Fontenelles are to-be believed, then Judge Meraux’s explanation establishes a perfect defense to this charge.” They further argue that the judge’s explanation of this matter is corroborated by Fontenelle’s own books, since his account in these books discloses that there have been many erasures in connection therewith and, in addition, that the lunches and refreshments furnished to the grand and petit juries fyave been charged against the judge’s personal account.
 

 If we accept the judge’s own testimony in connection with the charge in Article V of the petition as true, he was, to say the least, guilty of malfeasance and official misconduct when he certified the bills presented to him by Fontenelle in blank, since the very object of the act requiring the presiding judge to certify the correctness of such accounts is to place upon him the responsi- ' bility of seeing that the parish will be protected against the payment of any items other than those expressly provided for by law. According to his own testimony, he is also guilty of gross official misconduct because of his approval of statements which he says he thought covered refreshments, drinks, and cigars served to the attaches of the court (including himself and the district attorney), the attorneys in cases before the court, and the litigants, as well as the spectators around the court in the afternoon when the sessions were being held in Pointea-la-Hache, to say nothing of the times when neither the court nor the grand or petit juries were in session. There is no law authorizing the police juries of the several parishes to use the taxpayers’ money in such a manner, whether these expendio
 
 *515
 
 tures are approved by the presiding judge or not.
 

 We find, upon further analysis, that the judge testified it was the custom, during his ■ entire tenure of office, to furnish such drinks, refreshments, and cigars to persons about the courthouse, whether court was being held or not, but we do not find in the record that he ever called anyone to the witness stand to corroborate his statement in this respect, or that he ever attempted in any other way to have it substantiated. As against this we do find in the record testimony of some eight witnesses that were called to the stand by the district attorney in refutation, among them August Pigniolo, deputy sheriff of the parish who was present at all of the sessions of the court. Mr. Pigniolo testified that the only refreshments
 
 evef
 
 brought into the court house were those ordered for the grand jury and then only upon the foreman’s request; that at no time were drinks served to the court attaches, the lawyers, the litigants, or the spectators. To the same effect is the testimony of the seven other witnesses called by the district attorney, including the parish director of the State Department of Public Welfare, E. J. Ellzey; the clerk of court, Allen L. Lobrano; the assistant district attorney, Bruce Nunez; and the deputy tax assessor of Plaquemines Parish, Leo Scobel. -
 

 We must conclude, therefore, that the judge’s testimony to the effect that when he signed the statements presented to him by Fontenelle in blank he thought they were to cover refreshments served in court in accordance with a long established custom has been completely discredited.
 

 As to the condition of the statements when presented to the defendant judge for his signature, we find the testimony of Fontenelle to the effect that these statements were most positively filled out and itemized when so presented. In this Fontenelle is. corroborated by his son, Herman, who stated when he was on the witness stand that his father presented several of these statements to the Judge when he (Judge Meraux)-was in the store after the adjournment of the afternoon sessions and that on each occasion he saw the statements, which were fully made out before they were approved by the judge. We find, also, the testimony of Wilson Dauterive, deputy tax collector of Plaquemines Parish. Mr. Dauterive testified that he was present on several occasions when Fontenelle presented statements to Judge Meraux for approval in the sheriff’s office, and that in each instance the statements were fully itemized when so presented. On one of the occasions he (Dauterive) stated that Fontenelle, holding up the itemized statement just before he presented it to the judge for approval, said: “Look what I have got to do to get paid for the goods Judge Meraux bought in my store.” Judge Meraux himself admitted that some of the bills were fully itemized when presented to him for approval, the exact number of which he could not “say”.
 

 It is our opinion that Fontenelle’s testimony that the statements were fully made out when presented to Judge Meraux for approval has been convincingly substantiated in every instance, whereas the judge’s testimony in this respect has not only been successfully contradicted and overcome, but
 
 *517
 
 has also been impeached in instances other than those pointed out above. For example, in his answer to the allegations of Article V of plaintiff’s petition, Judge Meraux stated that'while he had an open account with Fontenelle, the account had been paid* from time to time out of his own personal money, and that at the time this removal suit was instituted he owed' Fontenelle “nothing for any goods purchased in either 1937, 1938 or 1939.” In the affidavit verifying the allegations of his answer, Judge Meraux swore “that all the allegations of fact contained therein are true.” Yet we find that when Judge Meraux was on the witness stand, under oath, he admitted that he did owe Fontenelle something, but that it could not amount to more than $25 or $30. Judge Meraux has not introduced one scintilla of evidence to prove that he made payments on this account from time to time — either by checks, receipts, or witnesses. In fact, Judge Meraux himself stated on the witness stand that he had never paid
 
 anything
 
 on this account, giving as his reason therefor that he had never received a statement of how much he owed Fontenelle. The only evidence in the record that shows how his account with Fontenelle was liquidated is in the form of the cashed vouchers of the Plaquemines Parish Police Jury and the entries in the Fontenelle books showing these amounts were credited to Judge Meraux’s account.
 

 The fact that there appear to be erasures in the judge’s account as it appears on the Fontenelle books, when considered alone, does not necessarily prove anything. Furthermore, whether or not Fontenelle’s explanation that these erasures were made at the direction of Judge Meraux in order to cover up the fraud by the inclusion in the account of the items covering lunches, meals, and refreshments furnished the grand and petit juries is true, is immaterial, since the fact remains that fhe parish has been defrauded of this money. The sole question presented for our determination is whether or not, all of the evidence in the record being considered, the charge against the defendant hás been proved with that degree of certainty required by the law in such cases.
 

 The testimony of the defendant has not been corroborated in any material aspect. The testimony of the only witness who testified for the defendant with respect to this charge, that of John R. Perez, proves absolutely nothing, much less does it corroborate any part of the defendant’s testimony. As a matter of fact, Mr. Perez himself, referring to the incident about which he testified, characterized it as’ being in his opinion “a joke.”
 

 On the other hand, the evidence introduced by the plaintiff, as above demonstrated, leaves the inescapable conclusion that Judge Meraux is guilty of the charge contained in Article V of the plaintiff’s petition. The proof is so convincing that no useful purpose could be served by going into the many other details in the record that could be pointed out to show the inconsistencies in' the testimony of the defendant himself or the other evidence that tends to impeach his testimony, such as that introduced to show he had purchased as many as 14 gallons of gasoline at a time from Fon
 
 *519
 
 tenelle’s store, though he denied ever having purchased more than 5 or 6 gallons on any one occasion and stated emphatically that he could not have purchased the 14 gallons, since the tank on his Ford V-8 held only 12 gallons. After the Fontenelles had testified that Judge Meraux did buy all of the gasoline charged to him, and Bruce Nunez had stated that he had practically always accompanied Judge Meraux when he made his trips to the Pointe-a-la-Hache courthouse, and that on each occasion, whether his or the judge’s car was used, upon the judge’s instruction, the tank of the car was filled with gasoline the amount of the gasoline purchased being charged to the judge’s account at the Fontenelle store, Judge Meraux admitted he had been mistaken in his testimony when confronted with the unimpeachable evidence contained in the Goodrich Accessory Blue Book, containing authoritative information relating to all makes .of automobiles, that the capacity of the gas tank on a Ford V-8 is 14 gallons.
 

 The charge in Article VI of the petition is with reference to the alleged ill treatment accorded Clarence Cargo by the defendant judge in obtaining from him a confession that he raised a check in his (Cargo’s) favor from $4 to $14 and cashed it at the store of Harry Fisher, brother-in-law of Judge Meraux, as well as to the illegal sentence imposed on Cargo for the crime.
 

 The evidence in this case is not sufficient to support the charge that the accused was mistreated by Judge Meraux, nor can the fact alone that an illegal sentence was imposed by the judge in this instance constitute misconduct in office, since isolated errors of this type are not uncommon; further, such error could have been easily corrected upon the request of the accused or someone on his behalf.
 

 Articles VII through XXIV inclusive include 19 misdemeanor cases involving some 29 defendants, in which cases the accused persons pleaded guilty when arraigned before the court in Plaquemines Parish. In each instance the judge is accused of having either unlawfully suspended the sentence or .of having illegally paroled the defendant.
 

 The defendant judge testified that he had an independent recollection of the facts in only a few of these cases but that he did know his action in each case had met with the consent and acquiescence of the district attorney or his assistant and had been done in their presence. He further declared that in most of the cases he knew the accused person personally, as well as his general reputation for honesty and integrity and that his action was prompted by the request of the defendant himself or by someone in
 
 his
 
 behalf.
 

 When Judge Meraux was previously before this court on removal charges brought by the then attorney general of the state, the Supreme Court pointed out, as stated in the syllabus to the disposition of the exceptions of no cause and no right of action filed by him, that though a district judge, under Act No. 74 of 1914, has the right “to suspend sentences in misdemeanor cases upon prisoner’s application, even after sentence has been pronounced, he has no right or power to order discharge of prisoners from jail, while serving sentence which has
 
 *521
 
 not been suspended,” and that if a “district judge released prisoners from custody after they had served only small part of sentences, where sentences had not been suspended, (his) conduct warranted removal from office on suit of Attorney General for high crimes and misdemeanors in office/ under Const.1921, art. 9, §§ 1,, 5, where course of judge’s conduct in other matters was alleged to be improper.” Saint v. Meraux, 163 La. 242, 111 So. 691, 692. (Brackets ours.)
 

 Without narrating in detail the evidence introduced in support of these charges, we think it sufficient to say that while the testimony as a whole does tend to warrant the conclusion that in some instances the judge showed favoritism, we are nevertheless of the opinion that his removal on these charges alone would not be justified.
 

 Articles XXV, XXVI, and XXVIII involve nine cases in which, although the defendants pleaded guilty to charges varying from felonious concubinage to trapping out of season, their sentences were deferred and had never been imposed at the time this removal suit was filed, in some instances as many as six years intervening.
 

 Plaintiff’s contention with respect to these cases is that the judge was either favoring the individual defendants or else that he was guilty of a misdemeanor in office under the provisions of Article 801 of the Code of Criminal Procedure providing that “Any judge * * * who shall wilfully fail, refuse, or neglect to perform any official duty required of him, personally, by law, as such officer, or who shall perform any such duty in an unlawful manner * * * shall be deemed guilty of a misdemeanor in office * * >}i
 

 In his answer to the allegations of these articles, the district judge has set up the defense that he had a right under Article 521 of the Code of Criminal Procedure to defer sentence in all of these cases, and that they were never thereafter refixed by the district attorney for the imposition of sentence.
 

 From the record it does not appear that there was any necessity for deferring sentence in these cases, for each defendant pleaded guilty and did not ask for a delay when the defendant judge questioned them with reference to any reason they might have as to why sentence should not be passed. See State ex rel. Chicola v. General Manager of Louisiana State Penitentiary, 188 La. 694, 177 So. 804.
 

 When testifying on the witness stand, the judge endeavored to further justify his actions with respect to these cases by stating that he never deferred sentencing these accused persons without first conferring with the district attorney, or his assistant, particularly with reference to the felonious concubinage cases, and that in any event it was the duty of the district attorney to re-fix the cases on the docket so that the sentences might be imposed.
 

 While we do not believe Judge Meraux would be justified in doing something unlawful, even if it were done upon the advice of and with the consent of the district attorney, we do not think the defendant’s conduct in these cases alone merits his removal from office.
 

 
 *523
 
 It is alleged in Article XXVII of the petition that the defendant illegally paroled Elmo Graffeo, jointly convicted of burglary with one Leo Jones, whom he remanded to jail to await sentence (Jones’ sentence not having been imposed some three weeks later, a motion for a new trial was filed in his behalf) no further action either as to sentencing Jones or passing on h'is motion for a new trial having been taken by the defendant judge up to the time this suit was filed, some two years later.
 

 In his answer the defendant alleges that the case against Graffeo and Jones was handled in a legal and lawful manner and that the only reason the motion for a new trial on behalf of Jones was not disposed of was because the district attorney failed to set the same for hearing; further, that this question is now moot since the two defendants were sentenced by Judge Paul De-Baillon after he was appointed temporary judge to handle the affairs of the Twenty-fifth Judicial District during the pendency of this suit. He further alleged that he acted in good faith in this matter and that his actions were in accordance with the law and the custom of the state in such cases.
 

 It is 'our opinion that the judge’s own testimony given in connection with this charge establishes that there was either favoritism and malfeasance in office on his part, or else the most gross incompetence, for in his testimony he declares:
 

 “I remanded Leo Jones to the Parish Jail to await sentence and Graffeo was released on his same bond, in the custody of Mr. Joly, who was a detective on the New Orleans Police Force. * * *”
 

 Continuing, he stated.: “I did not know Detective Joly. I believe that was the second time I had ever met Mr. Joly, but knew him by reputation, as being a member of the New Orleans Police Department’s Detective Bureau, and he gave me the reputation of Leo Jones as being an habitual criminal and I remanded him to jail, and Graffeo’s reputation, as stated by Detective Joly, was to the effect that Graffeo was not a bad boy, up to the time he met Jones, and began associating with bad company, and after he was released from the penitentiary, he married and had a good job with a soft drink mineral water company, somewhere out on Tulane Avenue, and the people at that place thought well of him, and I felt on the recommendation of Detective Joly and the fact that he had married and he was, in Joly’s estimation, a good boy, I felt I should parole him and give him a chance to go straight and for the further reason, that the indictment, as stated to me by Joly, was not a valid one.”
 

 Here we find a judge, on the recommendation of a man he admits he did not know, having only met him once before, remanding
 
 one
 
 of
 
 two
 
 persons convicted of a felony to the parish jail and paroling the other person convicted for the same crime, despite the fact that he had just been released from the penitentiary, because “he had married and he was,
 
 in Joly’s estimation,
 
 a good boy,” and for the further reason that the indictment
 
 "as stated to me by Joly,
 
 was not a valid one.” (Italics ours.) 'It is perfectly evident that if the indictment was not valid as to one of these defendants, it was equally invalid as to the other.
 

 
 *525
 
 According to the testimony of the judge, as reflected by the record, the burglary' with which the defendants were charged was alleged to have been committed in 1936, but in the information filed more than a year thereafter, or in 1938, prescription had not been negatived. On this point, the judge testified that after Detective Joly had called his attention to the defect in the indictment, he “called in Mr. McBride (an assistant district attorney) and
 
 we talked about the merits of the charge and Mr. McBride agreed that prescription had ran
 
 and I said, T could grant those two men a new trial on my own motion,’ and the Assistant District Attorney was there and I said to Mr. McBride, ‘What will you do?’ and he said, ‘If he is going to apply for a new trial I will nolle prosse the Information against him and Jones’
 
 and I said, ‘I will commit Leo Jones to the Parish Jail to await the disposition of the question of a new trial and I will release Graffeo, into the custody of Detective Joly,’
 
 who knew where Grafifeo lived and who knew him well and who said he would be glad to look after Graffeo,
 
 and that was the end of it.
 
 As to the motion for a new trial, I did not hear any more of it and the matter stood that way. There was no change in the matter, until after I was removed, by order of the Supreme Court.”
 

 There is also an allegation in the petition (Article XXIX) to the effect that at Judge Meraux’s instigation a collection was taken from the gambling houses in St. Bernard Parish for the purpose of buying him a Lincoln Zephyr automobile, which automobile was soon thereafter traded in by Judge Meraux in New Orleans for a Ford sedan, the difference in the value of the two cars being retained by him, but this charge has apparently been abandoned by the plaintiff since there is no evidence in the record in support thereof and there is no mention of the matter in his brief.-
 

 Article XXX of the petition charges the judge with favoritism and oppression in office because he concealed and absented himself in order to make it impossible for the litigants and attorneys in 8 election cases in St. Bernard Parish and 2 in Plaquemines Parish to have their cases tried within the time prescribed by law in such cases, making it necessary for these parties to appeal to the Supreme Court for the appointment of a judge ad hoc to protect their rights by timely trying the cases. The charge of favoritism is based on the allegation that in the cases where Judge Meraux’s political enemies were seeking a hearing of their rights, the judge could not be found to sign the papers necessary to placing them before the court, while in cases in which his political allies were concerned, he was available at all times to protect their rights.
 

 In support of this charge George Leppert, an attorney, testified that the Plequemines Parish Democratic Executive Committee met on the Saturday following the primary elections in 1940 and handed down a ruling adverse to his clients; that he had only 48 hours under the law in which to test this ruling; and that inasmuch as one of these cases involved the clerk of court for the district, the only remaining person who
 
 *527
 
 could sign the rule he wished to file against the interested parties to test the ruling of the committee was the district judge. He stated further that after he had prepared», his petitions in these cases he made a diligent effort to find the judge, going personally to every place in the district where he thought he might he, — to the courthouse, to his home, to the store of the judge’s brother-in-law near the judge’s home, to the filling station at the junction of the road near the Violet Canal, which road led to the judge’s fishing camp, where he thought possibly he might have gone, to the judge’s office in the city of New Orleans — and that he left word at all of these places, with the exception of the judge’s home, where no one answered his ring, requesting the judge to get in touch with him by telephone. It was only after he failed to locate the judge that he was compelled to apply to the Supreme Court for the assignment of another judge to act in the cases.
 

 With respect to the two cases in Plaque-mines Parish, the clerk of court testified that while Judge Meraux did sign the order fixing the return date in these two cases, he absented himself from court on that day, notifying the clerk to continue all of the cases fixed for that particular day, no further action being taken by the judge in these matters, the cases subsequently being tried by Judge Byrnes of the Civil District Court of Orleans who had been appointed by the Supreme Court for that purpose.
 

 In his answer to the allegations of this article, the defendant stated the parties in the St. Bernard cases made no effort to contact him for the reason that they did not want him to try the cases, believing they could secure the services of a judge who would be more favorably disposed toward them, and that he was not only available at all times to these parties, but that he was ready and willing to try their cases. In so far as the Plaquemines Parish cases were concerned, he stated he was ready and willing to try those cases, but that “before he had ever seen the pleadings he was superseded by a Judge appointed by the Supreme Court without his notice.”
 

 In support of the allegations in his answer, the judge denied on the witness stand that George Leppert had come to his home on the day specified by him. He stated he remembered the day, January 22, 1940, very clearly because it had been very cloudy and rainy; that he left his home about ten in the morning and went to the bank at St. Bernard, advising his sisters he would be back about 11:30 or noon, and that he did in fact return to his home about noon, where he remained for the rest of the day; that his sisters told him George Leppert did not come to the house or ring the bell during the two hours he was away at the bank; and that from that time on he knew of his own knowledge George Leppert had not called at his home; that the litigants in the Plaquemines Parish cases came to his home about four in the afternoon on that same day, he then and there signing the orders in those cases.
 

 It is interesting to note that although the judge in his answer declares he was
 
 *529
 
 superseded “before he had ever seen the pleadings” in the Plaquemines Parish cases, on the witness stand, when questioned with respect to these two cases, he testified that “Mr. Oliver Livaudais came to my home with two orders, one in the case of Livaudais vs. Leovy and the other one was Treadaway vs. The Plaquemines Parish Democratic Committee. * * * I signed the orders in both those cases * * * At my home in Merauxville.”
 

 We pointed out in the case of Eugene Stanley, Attorney General, v. James W. Jones, Jr., 9 So.2d 678,
 
 [1]
 
 being handed down today, that “The fact that he (Judge Jones) did not get that information (relative to proceeds of a check given to a brother of his court reporter by Judge Jones’s wife) and produce it raises the strongest presumption that he could not produce it. It was said in the case of Crescent City Ice Co. v. Ermann, 36 La. Ann. 841, ‘The presumption is always and inevitably against a litigant who fails to furnish evidence within his reach’, and said in Jones on Evidence, Volume I, Section 17, page 49, -that ‘There is a recognized legal presumption that a party will produce evidence which is favorable to him if such evidence exists and is available.’ ”
 

 It is our opinion that Judge Meraux could have easily removed all doubt with respect to the charge that he absented himself from his home by placing either Mr. Oliver Livaudais or his sisters on the witness stand to corroborate this fact. Since- he did not, we must conclude that his failure to place any of these parties on the stand can only mean that had they taken the stand they would have testified adversely to his cause.
 

 In the next article (XXXI) the defendant is charged with having, in defiance of the order of this court, tried two mandamus suits against the registrar of voters in St. Bernard Parish involving suits for the reinstatement of voters whose names had been “scratched” off the registration rolls, without the intervention of a jury of 12, as required by law.
 

 Counsel for defendant contend that the disregarding of the order of the Supreme Court in these vote cases “was an error of judgment, resulting from Judge Meraux’s honest misinterpretation of its terms.”
 

 Our order reads as follows:
 

 “It Is Ordered, that the honorable J. Claude Meraux, Judge of the 25th Judicial District Court, in and for the Parish of St. Bernard, shall act upon the motion for his recusation before any other proceeding is had in the trial of these suits, or show cause in this Court on Monday, February 19, 1940, at 11:00 o’clock A.M., why he does not act upon said motion, either by recusing himself, or by referring the motion to a judge ad hoc before any other proceedings are had in the trial of these suits.”
 

 In testifying on this phase of the case the judge declared: “I received this order in the morning and read it.
 
 I did not study it, but read it hurriedly,
 
 and the first clause that struck my attention, was the
 
 *531
 
 first part, ‘Shall act on motion for his recusation, before any other proceedings is had in the trial of this suit.’
 
 I read the order and re-read it
 
 and that first part, ‘Shall act on the motion for his recusation before any other proceedings is had in the trial of this suit,’ and on that I proceeded to act, and when I -found out that contempt proceedings were filed, I made a study of the Supreme Court order and found it said, ‘By either recusing,’ which is at the bottom and I thought I had to act on the motion or show cause in the Supreme Court why I should not and either recuse myself or appoint another. Judge and that was my interpretation of the order.” Further, in answer to the question: “When did you find out you misinterpreted the order of the Supreme Court?” he replied: “I found out they filed a motion in the Supreme Court, asking the Supreme Court to charge me with contempt, for violating that order and after reading the order of the Supreme Court, I felt I might have disobeyed the orders of the Supreme Court. I have been a Judge a long time and received numerous orders of the Supreme Court and obeyed them all and if I made this mistake, it was an honest mistake.” (Italics ours.)
 

 It is interesting to note that the judge first stated he read the order “hurriedly” without studying it, yet immediately thereafter he states that he “read the order and re-read it.” If he read the order of this court at all, even hurriedly, couched as it was in the plain language and terms quoted above, it is inconceivable to us how Judge Meraux could have proceeded with the trial of these two mandamus suits. The judge’s explanation given in an effort -to justify his ignoring of this order, to say the least, tends to show that he looked upon the duties of his office in dealing with the rights of others rather lightly or that he had little respect for the orders of this court.
 

 We now pass to the last article of the petition (Article XXXII), wherein the defendant is charged with illegally granting judgments in hundreds of divorce and annulment cases in collusion with the attorneys and litigants, and with permitting his court tó be used as an unlawful “divorce mill.” -The factual details and the proceedings are categorically given in one hundred such cases.
 

 In his answer to this article the defendant specifically denied the allegations, again urging that any illegal divorce or annulment judgments rendered prior to his present term of office cannot be considered in this proceeding for his removal and that his motion to strike, therefore, should be applied in 36 of the 100 cases, this being the number alleged to have been heard prior to his present term of office.
 

 In support of the allegations of this article, the plaintiff introduced the original records in the 100 divorce and annulment cases listed therein. Mr. Allen Lobrano, the clerk of court, testified in connection with the introduction of these records, particularly with reference to the cases filed by one of the attorneys, Henry G. Fallon, who, Lobrano stated, proved up his divorce cases by reading questions and answers from a previously prepared note of evi
 
 *533
 
 dence and then asking the witnesses whether or not that reflected their testimony.
 

 The defendant, testifying in his own behalf, branded as false the charge that there had ever been any collusion between him, the attorneys, and litigants in these cases, stating that while he had no independent recollection of any of the particular cases, he knew the judgments in these instances had been rendered in accordance with the custom employed in the handling of confirmations of defaults and uncontested cases in civil matters, which custom, he stated, was the same in all of the district courts of the state, that is, that the judge, instead of reading the petition or having it read to him, is informed of the nature of the action by the attorney handling the case, which attorney then offers proof in support thereof, the judgment being granted and signed if warranted by the evidence. To substantiate the statement with reference to this alleged custom, the defendant called to the witness stand the minute clerks of two of the divisions of the Civil District Court for the Parish of Orleans, but we find, after reading their testimony as a whole, that the same has little, if any, probative value in so far as the merits of this case are concerned. The defendant also introduced the original proceedings in ten divorce cases in which Bruce Nunez, Assistant District Attorney under Leander H. Perez, is the attorney of record.
 

 A most casual study of the original records in the 100 divorce and annulment cases will show that in a large majority of them the court had no jurisdiction whatsoever, either over the parties or over the cause of action. For example, in the case of Martin v. McCarty, No. 2,090, Exhibit No. 32-3, the allegations of the petition are that the plaintiff is a resident of St. Bernard Parish ; that the marriage occurred in Liberty, Missouri; that petitioner and his wife separated on or about March 1, 1932; that more than four years have elapsed since the separation, entitling him to a divorce» on that ground. This petition was not filed until May 19, 1937, although an answer, in which all of the allegations of the petition were admitted, was sworn to in Alabama on May 17, 1937, service of the petition having been accepted and citation waived. On an unspecified date, the defendant also accepted service of notice of' the fixing of the case for trial. There is nothing to show where the marital domicile was located or where the parties were living at the time of the separation. There is in the record the marriage certificate, showing that the plaintiff was a resident of Chicago, Illinois, and the defendant a resident of San Antonio, Texas, at the time of the marriage. In the note of evidence there is a statement to the effect that the plaintiff received an air mail special delivery letter from his wife which was postmarked “Hico, Texas,” wherein she asked him to file suit for divorce “here,” apparently meaning St. Bernard Parish. There is also a statement that all of the • papers in the matter were sent to the defendant in Texas and returned by her air mail in an envelope postmarked “Hico, Texas.” These letters and their envelopes are in evidence. They clearly show that when the defendant returned these papers
 
 *535
 
 to the plaintiff, they were mailed to him at 820 Poydras Street in the City of New Orleans, Louisiana, although in the petition the plaintiff alleges he is a resident of St. Bernard Parish.
 

 As another example of the lack of jurisdiction, we might consider the case of Fitzpatrick v. Fitzpatrick, No. 1,199, Exhibit. No. 32-57. In that case the plaintiff alleges that she is a “resident of the City of New Orleans, State of Louisiana”;. that she-married the defendant “in the City of New Orleans, La.”; that while living in the Parish of St. Bernard, they were separated; that since her separation she has been living “continuously i-n the State of Louisiana;” and that she is entitled to a divorce on the ground of four years’ separation. Service of this petition was accepted by the defendant on October 2, 193d although the petition itself was not filed until October 7, 1936. No answer was filed, the defendant was given no notice of the fixing of the case for trial, and he has apparently never been.notified of the judgment of divorce which was rendered ajgainst him by
 
 default.
 

 Possibly one of the most glaring examples of the lack of jurisdiction is to be found in the ca$e of Foy v. Kronjager, No. 2,336, Exhibit No. 32-25. In her petition the plaintiff alleges she is a “resident of the State of Louisiana”; that she was “married in the State of Mississippi”; that the “matrimonial domicile has always been in this state.” There is nothing to show the domicile or present whereabouts of the defendant, since he accepted service and Waived citation. The charge is that the defendant committed adultery with one “Billie Smith.” The defendant filed an answer in proper person wherein he “admitted” all of the allegations of the petition and submitted the matter to the court for judgment. With the defendant absent and unrepresented, judgment was rendered granting the divorce. The plaintiff’s petition in this case was filed on April 17, 1939; the judgment of divorce was granted and signed on April 24, 1939.
 

 In many cases the petition does not even disclose a cause of action. For example, in the case of, Schmid v. Lopez, No. 1,081, Exhibit No. 32-40, the plaintiff alleges in her petition that her husband has been “guilty of indiscretions with a certain woman,” the divorce being granted upon the uncorroborated testimony of the plaintiff “that she was not present when the indiscretions relied upon by her in her petition were committed, but she believes same to be true.”
 

 In almost none of the annulment cases does the petition disclose a cause or right of action, many of these cases being based on the ground that the petitioner and the defendant “had a number of expressed, as well as implied pre-nuptial agreements, and understandings, upon which their marriage was conditioned, all of which conditions have since failed.” In those cases judgments annulling the marriage were granted after the plaintiff alone “verified the allegations of her petition and admitted her signature appended thereto.”
 

 There are as many as 20 instances where the divorces or annulments were secured in less than 10 days, two-day and three-day
 
 *537
 
 judgments of divorce or annulment not being uncommon. For example, in the case of Feinstein v. Brown, No. 1,048, Exhibit No. 32-1, the petition was filed on June 27, 1935. Service was accepted on the same day by a curator ad hoc appointed to represent the defendant, then alleged to be living in Atlanta, Georgia. There is nothing to show that the curator ever made any attempt to get in touch with 'the defendant, but on June 29, 1935, he filed an answer denying all of the allegations of the petition. Without notice of trial, the case was heard on the same day and judgment of divorce on the grounds of living separate and apart for four years was signed on the same day, i.e., June 29, 1935.
 

 Instances where the answer of the defendant was sworn to previous to the time when the petition was filed are numerous. In the case of Helmke v. Brunner, No. 2,236, Exhibit No. 32-2, the petition alleges that the plaintiff is a “resident of the State of Louisiana”; “That she was married to William F. Brunner in the City of New Orleans,” on July 1st, 1914”; “That on or about June 13th, 1931, petitioner and her said husband separated, and have lived separate and apart since that time”; and that she is entitled to a divorce on the .ground “that more than four years have •elapsed since the said separation.” The plaintiff’s petition was filed on June 25, 1938. The defendant’s answer, in which he admitted all of the allegations of the petition, shows that it was sworn to on. October 13, 1936, or more than 20 months before the plaintiff filed her suit.
 

 ■ In a great number of the cases the judgments were rendered without the defendant having been notified that the case was fixed for trial. In- many instances the defendant himself (or herself) moved to' have the case fixed for trial and if is apparent that such motion was drawn up by the attorney representing the plaintiff.
 

 • In the case of Moroy v. Gowanloch, No. 2,235, Exhibit No. 32-89, the petition alleges that the petitioner is a resident “of the State of Louisiana,” that she and the defendant were married in “Jefferson,” that she “and the said
 
 Gowanloch did not have a serious or valid intention to contract a legal marriage; that their consent was not free in that it was given under conditions in which they were
 
 mistakenThese conditions were the pre-nuptial agreements and understandings existing between .the petitioner and the defendant upon which the marriage was conditioned,
 
 “all of which conditions have since
 
 failedThe petition in this annulment case was sworn to on June 20, 1938, and service was accepted. The answer of the defendant, palpably prepared by the plaintiff’s attorney at the time the petition was prepared, was sworn to on June 20, 1938, and filed on the same day, june 20, 1938. Upon the uncorroborated testimony of the petitioner verifying “the allegations of her petition” and admitting “her signature appended thereto,” the annulment was granted on June 25, 1938, the same day on which the case was tried, only 5 days after the petition and answer were filed. (Italics ours.)
 

 
 *539
 
 In. the case of Bozant v. Sison, No. 2,243, Exhibit No. 32-93, the plaintiff alleges that while she did not know the defendant intimately, she met him when he telephoned her; he then persuaded her to marry him. Her reason for desiring that the marriage be annulled is “that at that time
 
 she did not realize the seriousness of marriage and only thought of the romantic side of marriage, and consented to have the ceremony performed, while in that -state of mind."
 
 Without any further evidence than that of the plaintiff who “verified the allegations of her petition and admitted her signature appended thereto,” and the testimony of Robert Porche, who “was duly sworn,^ and corroborated the plaintiff, Irene Bozant, in every respect,” the annulment was granted. (Italics ours.)
 

 Any number of other instances might be given. For example, in one of the annulment cases (Jackson v. Amedee, No. 2,095, Exhibit No. 32-86), the judgment was granted on the
 
 joint
 
 petition of the husband and wife. When questioned with reference to this case, the judge stated: “ * * *
 
 this is a petition on behalf of two plaintiffs, asking for an annulment. It would be impossible to have rendered a judgment on the face of 'the papers, because there is no defendant and the note of evidence does not prove anything.”
 
 (Italics ours.)
 

 In some 24 of the 100 cases the defendant admitted, on the witness stand, that had ,he known the contents of the records in ■ those cases, he would not have rendered judgment. Twenty of these cases showed plainly on their face that the judge had no jurisdiction. In the other 4, collusion between the parties was obvious. In a large number of the cases the records show that both collusion and fraud were used to obtain the divorces and annulments, while in all of them there are glaring defects and irregularities that would not have gone unnoticed had the presiding judge been attending to the duties and the functions of his office with the degree of care and competence required of a prudent judge.
 

 The defendant, in order to justify his actions in signing judgments where on the face of the pleadings the petition did not disclose a cause of action and his court did not have jurisdiction, stated that according to the prevailing custom the petitions were not read to him, he depending entirely upon the ability and integrity of the attorneys in presenting their cases correctly. Although he did admit in some 24 instances that had he read the petition or been apprised of the contents thereof he would not have signed the judgment, he stated that evidently in those cases the pleadings were enlarged by the evidence so as to give the plaintiff a cause of action and his court jurisdiction, otherwise he would not have signed the judgments, his explanation being:
 
 It was "* * * from the testimony of the witnesses and the statement of the attorney, I determined whether the allegations and the proof warranted a judgment, whether the Court had jurisdiction and the pleadings disclosed a cause of action.”
 
 For example, in the two-year separation divorce cases where . the person invoking the jurisdiction of the court failed to allege that during the two-year period he had lived in St. Bernard
 
 *541
 
 Parish, if, according to the judge’s explanation, the evidence did show the petitioner had lived in St. Bernard Parish during that period, the pleadings would be enlarged accordingly, thereby giving the plaintiff a cause of action and the court jurisdiction. The defendant’s explanation as to why the notes' of evidence in the record fail to reflect the facts as stated by him, is that the notes of evidence do not show what actually occurred during the trial of these cases, for ‘ the reason that, having no court stenographer, they were prepared by the attorneys at his (the judge’s) request after the evidence had been heard in court.
 

 The judge’s testimony in this respect is more or less the same in connection with all of these cases and is along the line of his answer to the question “Did your Court then have jurisdiction of that case?” propounded to him with reference to Exhibit -32-12: “At the time it was presented to me, I would say, yes, and in fact it did have for the same reason the attorney moved, to prove a cause of adultery, and this is a default case, and I am certain, when the witnesses were interrogated, they testified they lived in the Parish of St. Bernard and it warranted me to sign the judgment, as I was satisfied they had a cause of action and I had jurisdiction and,
 
 in all
 
 cases,
 
 where St. Bernard is not written in the
 
 pleading,
 
 they can testify they lived in St. Bernard and that would enlarge the
 
 pleading, and in other cases, it was being done, in contested cases, and in uncontested cases, they would be allowed •to enlarge the pleadings and in default cases they would enlarge the pleadings by their testimony.” (Italics ours.)
 

 The judge is clearly in error in his contention in this respect, for the universal rule is, as stated in 34 C.J. 153, that “A default admits only what is well pleaded, and therefore in order to sustain a judgment by default, plaintiff’s declaration, complaint, petition, or statement, of claim, must allege with clearness and certainty sufficient facts to constitute a good cause of action or show a right to recover.” See, also, 15 Ruling Case Law 605, Section 44.
 

 These authorities were cited with approval in the case of Simon v. Duet, 177 La. 337, 148 So. 250, 251, where the question was whether or not the defendant was entitled to have a judgment rendered against her by default set aside. The court said: “We hold that she is, even though it be conceded that the testimony adduced by plaintiff on confirmation of the default was such as to warrant a judgment for the divorce on the ground of adultery. The reason is-that there was no charge of adultery made against her, and the judgment has no foundation on which to rest. The plaintiff, not having set out a ground or basis for relief, could get none, even though defendant made no appearance.” See, also, Louisiana State Bank v. Senecal, 9 La. 225; Lockett v. Toby, 10 La.Ann. 713; Michel v. Dolliole, 1 La.Ann. 459; Medley & Co. v. Wetzlar, 5 La.Ann. 217; and Woodall v. Louisiana Ry. & Nav. Co., 149 La. 903, 90 So. 238, 240.
 

 As was very aptly pointed out in the case of Woodall v. Louisiana Ry. & Nav. Co., supra,
 
 “The rule established by the
 
 
 *543
 

 decisions cited,
 
 that a defendant who has not answered or pleaded to the suit, and against whom a judgment may therefore be taken by default, should have the judge’s protection against the introduction of evidence that is not admissible under the allegations of plaintiff’s petition,
 
 is founded upon reason and justice. A defendant who has not seen fit to answer a suit upon one cause of action, particulai'ly set forth in the plaintiff’s petition, should have no fear that judgment will be rendered against him on another cause of action.”
 
 (Italics ours.)
 

 It is argued by counsel for defendant, however, that Article XXXII charges the defendant only with permitting his court to be used to operate a “divorce mill” in collusion with the attorneys and litigants, and does not charge that Judge Meraux was negligent or incompetent in this respect, and that since the evidence does not support the charge of collusion, malfeasance no longer being a cause for removal under our constitution, the plaintiff’s action, in so far as this article is concerned, must fail.
 

 Counsel are in error in their contention that Article XXXII does not charge the defendant with incompetence or negligence in his handling of these divorce and annulment cases, or else they have overlooked the last paragraph of the article, for therein it is specifically stated
 
 “That petitioner annexes hereto and files herewith the original records in the above 100 divorce and annulment ■ cases
 
 * * *
 
 in order, to submit the same to the Supreme Court of Louisiana in their original form as further evidence of the incompetency, favoritism, gross misconduct, oppression, high crimes and misdemeanors in office of the said I. Claude Meraux, Judge
 
 * * (Italics ours.)
 

 Moreover, the evidence in the record unmistakably shows that the court over which the defendant judge presided was used in obtaining illegal judgments of divorce and annulment of marriages where, in a large number of instances, collusion and fraud were employed. We are not impressed with the protestations of the judge that he had no knowledge of these facts — in other words, his claim that advantage was taken of him by the attorneys and litigants in these cases —for it is difficult for us to understand just how the judge could sit and hear such a large number of cases in which so many irregularities are patent on the face of the record and the notes of evidence so scant, without at least having his suspicions-aroused as to what was going on. Particularly is this true when as many as three of these cases were heard by him in a single day. Then, too, the striking similarity in the method employed in the handling of these cases by the four principal attorneys who are involved should, in our opinion, have placed him on his guard.
 

 The facts in most of these 100 records, make the defendant’s testimony in connection with this charge almost impossible of belief. For example, in the case of Lombardo v. Martinez, No. 2,327, Exhibit No. 32-90, the plaintiff brought suit to have her marriage annulled on .the ground that she and the defendant “had a number of ex
 
 *545
 
 pressed, as well as implied, pre-nuptial agreements, and understandings, upon which their marriage was conditioned, all of which conditions have since failed.” She alleged that she was “a resident of the State of Louisiana”; that she was married to the defendant, “also * * * a resident of this State,” “in the Parish of Orleans”; and that she and the defendant “have never established a home, nor have they lived together.” The defendant was served at his address in New Orleans and, in one of the rare cases among the 100 examples where counsel was employed by the defendant, he excepted to the jurisdiction of the St. Bernard court on the ground “That the plaintiff and exceptor are both domiciled in the Parish of Orleans, State of Louisiana and that the matrimonial domicile is in the Parish of Orleans, State of Louisiana and that this Court is, therefore, without jurisdiction ‘ratione personae.’ ” No notice of trial was served on the defendant, but on the day of the trial the defendant, through his attorney, withdrew the exception to the jurisdiction and submitted the case. This motion was withdrawn upon the order signed by Judge Meraux, who,
 
 on the same day,
 
 also signed the judgment annulling the marriage. In the note of evidence it is stated that “The defendant, through his attorney, Mr. M. E. Culligan, having heretofore on April 13th, 1939, filed an exception to the jurisdiction ratione personae, has this day filed a motion and order to withdraw and dismiss the said exception to the jurisdiction and submit -the merits of the matter to the judgment of the court.”
 

 We are equally unimpressed with the suggestion that the mere matter of 100 irregularities in civil cases (whether they involve divorces, annulments of marriages, or other civil matters) over a period of 9 years does not constitute such unlawful conduct on the part of Judge Meraux as to-warrant his removal. As was pointed out when we disposed of the exceptions of no^ cause and no right of action filed by Judge Meraux in this case, “It might be that a single act of this nature would not be a sufficient ground for removal, but many acts of irregularity and illegality might show a cause (course) of conduct of such a grave nature as to justify removal. One wrongful act might be considered an error in judgment, but a continuity of wrongful acts could not be so considered.” (Brackets ours.)
 

 The record shows that of the cases involved here, 2 were filed in the year 1932. In the years 1933 and 1934, 1 case was filed in each year. Sixteen cases were filed in each of the following years: 1935, 1936, and 1939. This means that all of the remaining 100 cases, or approximately half, were filed during the years 1937 and 1938. As pointed out above, in the majority of these cases, in addition to it being apparent that they were obtained through collusion and fraud, the court was without jurisdiction and the judgments rendered in those cases are absolutely null and void, subj ect to attack at any time. The parties in those cases have, therefore, been illegally released from their marital contract and they are now in such a position that innocent third
 
 *547
 
 parties contracting marriage with them on the faith of these illegal judgments will not only be affected, but the innocent children born of such unions as well, á visitation which no one would want brought upon his sons and daughters.
 

 It is our conclusion, therefore, that, considering the judge’s own version of his conduct in these cases, and taking it to be true, he has been most derelict in performing the functions of his office, and has proved himself to be incompetent to sit in trial where the rights and liberties of others are involved.
 

 As was said in the case of State v. Lazarus, 39 La.Ann. 142, 1 So. 361, 376, the framers of our constitution, acting upon the idea contained in the paternal recommendaion of the first, the great Chief Justice of Louisiana, Judge Martin, that “All those who minister in the temple of justice, from the highest to the lowest, should be above reproach and suspicion. None should serve at its altar whose conduct is at variance with his obligations,” have imposed on us the duty of seeing “to it that none but able, conscientious, and irrepproachable judges should, by (our) decree, be ever retained as magistrates in the state of Louisiana,” and, however unpleasant the task may be “it must be performed impartially and fearlessly.”
 

 For the reasons assigned, it is ordered, adjudged, and decreed, that J. Claude Meraux, be and he is hereby removed from his office as Judge of the Twenty-fifth Judicial District Court for the Parishes of St.' Bernard and Plaquemines, all costs of this proceeding to be paid by the defendant.
 

 O’NIELL, C. J., concurs in the decree.
 

 HIGGINS, J., concurs in the decree and assigns reasons.
 

 [1]
 

 201 La. 549.