CAVANAUGH, Judge.
This is a suit to recover $25,459, with legal interest from judicial demand until paid, as damages and medical expenses for alleged permanent injuries sustained by the plaintiff while engaged in the United States Postal Service as a railway mail clerk on one of defendant’s passenger trains being operated between Houston, Texas, and New Orleans, Louisiana.
The plaintiff alleges, in substance, that the defendant is the duly appointed trustee in the proceedings for the reorganization of the railroad, and that prior to May 7, 1950, had full charge and control of the business and affairs of the New Orleans, Texas and Pacific Railway Company, and prior to and on the date mentioned was in possession of all of its property and the operation of its trains and other railroad facilities; that on or about May 6, 1950, plaintiff was employed as a postal transportation clerk on Train No. 10 in one of the mail cars operated by the defendant, and on or about May 7, 1950, while performing and acting within the scope and course of his employment and while executing his duties as a postal transportation clerk in the mail car attached to one of defendant’s trains which is used in the operation of its business and being operated on said date, and while said train was being operated by an authorized agent, servant and employee of defendant, acting within the scope and course of his employment at Port Barre, St. Landry Parish, Louisiana, the operator of said train carelessly and recklessly stopped the locomotive to which the mail car was attached causing plaintiff serious and permanent injuries and that the defendant’s agent, servant or employee was actually heedless of plaintiff's rights and welfare and acted in a careless and reckless disregard of the life of plaintiff and suddenly started said locomotive, or, alternatively, suddenly stopped said locomotive in a neg" ligent manner. The specific acts of negligence charged against defendant are the following:
(a) In failing to keep said locomotive under proper control at the time and place of said accident.
(b) In failing to use a high degree of care at the time and place of said accident.
(e)In. failing to start the operation of said locomotive as a reasonably prudent person, skilled in the business, would have done under the same or similar circumstances.
(d) In failing to operate said locomotive at the time and place in question as a reasonably prudent person would have done under the same or similar circumstances.
(e) In failing to start said locomotive in such a manner as a locomotive engineer, or one skilled in the vocation of an engineer, would have started same under all the facts and circumstances.
(f) In failing to have said mail car equipped in such a manner that same would have absorbed or withstood the shock caused by a sudden stop, jolting or jerking or starting of the locomotive.
(g) In starting said locomotive with unexpected suddenness.
(h) In stopping said locomotive with unexpected suddenness.
The plaintiff further alleges that as a result of the negligence of defendant, he was severely damaged and permanently injured in that the ligaments, structure and muscles of his right side became totally paralyzed, and he suffered pain in the right groin and testicle and swelling in the left groin and severe injuries to the posterior wall of the right inguinal canal and other injuries and shock, causing pain producing and causing a bilateral hernia. He further alleges that at the time of the accident and injury he was earning $3,970 per year, and that his earning capacity has decreased and he cannot, under any circumstances whatever, *559 perform the duties he was engaged in prior to the accident.
The defense to the suit is a general denial.
The case was submitted to a jury duly empanelled and sworn, that returned a verdict for the- plaintiff in the .sum of $10,000. The defendant filed a motion for new trial, which was regularly heard and overruled, and from the verdict and judgment entered by the lower court the defendant has brought this appeal. The plaintiff has answered the appeal asking that we increase the award to $25,459.
In this court, the defendant has filed an alternative motion, in the event we do not bold that the lower court committed manifest error by not setting the verdict and judgment aside, and granting a new trial, to remand the cause for the purpose of taking evidence to show that the plaintiff exaggerated his disability and earning capacity at the time the case was submitted to the jury.
The defendant-appellant urges here that the issue in plaintiff’s case is not whether plaintiff had or did have a double hernia when he was examined by Dr. J. J. Stagg in January of 1951, eight months after the accident, or whether he did or did not have .a recurrence of the hernia in the right inguinal region which was found by Dr. George D. Broyles, Jr. of Houston, Texas, when he examined plaintiff on August 19, 1952, more than two years after the alleged accident; that the only question in the ■case is: Did the plaintiff prove with legal certainty that the double hernia which Dr. .Stagg found in January, 195-1, resulted from an accident which was caused by the negligence of the operator of the train ■of defendant. The appellant seriously contends that the evidence submitted by the plaintiff to prove the accident and the negligence of the defendant was not sufficient for the jury to have rendered a verdict in favor of plaintiff.
We will say in the beginning that we are not unmindful of that principle of law that ■we should not reverse a judgment in favor ■of a plaintiff in a case of this kind unless there is manifest error and that the evidence produced does not sustain the judgment. ' With that principle of law in mind, we will now proceed to review the evidence.
Prior to plaintiff’s employment as a mail carrier, in 1941 he had undergone an operation classified as a bilateral herniaplasty in order to make himself physically fit to pass a physical examination to enter the Postal Railway Transportation Service. This operation was performed by his family physician, Dr. J. J. Stagg, of Eunice, Louisiana. He made a satisfactory recovery from the operation within the ordinary time required for recuperation and entered upon his duties as a railway mail clerk. The next corroborative evidence he offers to sustain the recurrence of the hernia was in October, 1951, or six months after the alleged accident, when he consulted counsel who made demand on defendant for damages. Dr. Stagg examined plaintiff in January, 1951, and repaired the bilateral hernia by surgery. He next was examined by Dr. Stagg several months after the operation, and he found that the hernias had healed. According to his testimony, at the time he was discharged there had been no recurrence of the hernia on either side. He was examined again by Dr. Stagg in August, 1952, and also by Dr. George D. Broyles, Jr., of Houston, Texas, at defendant’s request, and at that time it was found that he had a recurrence of the hernia on the right side. Between the date of the alleged accident on May 7, 1950, plaintiff’s uncorroborated statement states he was examined by Dr. Gordon of Houston, Texas, on May 10, 1950, following the accident, and was examined by Dr. Thompson of Eunice, Louisiana, on Monday, May 9, 1950, or two days following the accident; that both of these physicians advised him that he had a bilateral hernia. Neither of these witnesses were called by plaintiff to support his charge that he received the hernia in the railway mail car being operated by defendant. When Dr. Stagg examined him in January, 1951, he found what he described as a recurrence of an old hernia.
*560 This suit, was filed on March 8, 1951, and was not tried until the month of December,, 1952, or nearly two years after the filing of the suit. The plaintiff describes the time and the occasion when he claims to have suffered, the fall in the mail car at Port Barre,- Ebuisiana, and his move-ménts just prior to and' subsequent to the accident in his testimony-as follóws:
“A. To b'egin with I went to work early that night, possibly at 7:35 in Houston, the train leaving two hours later, or about 9:35 and the best I remember it was on á Saturday night and through the course of the night nothing happened and we put off our regular'" mail’until we got to Port Barre. Now, ■ ¿t Port' Barre is not k regular stop but' • we do put off tWo pouches at that time,we had one: that we make up while sorting mail durihg the course of the trip while the train is going from station to station and one that" is picked up at Opelousas because it is too close to sort so much mail in such'a short time. Now the train usually slows down at ‘ tlife station and you throw this mail off, •' but on that particular night when they blowed for the crossing somewhere at " Bayou Teche, I went to the door with my pouches and stood at the doo'r wait- • ing for them to get to the Station, but on arriving at the water tank the train came to a stop. I thought that I would - have time enough to pull some more sacks out of the rack while they were taking on water for the reason that they stopped at the water tank. I went-back and pulled out a large sack of mail, probably weighing sixty, seventy or eighty pounds. After I pulled it out of the rack, I picked it up in my arms and started to - the rear of the train where the bins are. The train came to a sudden stop, a probably violent stop and I stumbled around and fell with the sack in my arms, or it fell on me, something like that. So after that, I used a ■few words, probably subconsciously and I got up after that and went on and finished the run. ,.
“Q. How were you carrying this sack in your arms? A. In my arms this way.
“Q. Was the sack erect? A. Erect..
“Q. Will yoü describe this jolt that you received? Was it an ordinary jolt or a severe and violent jolt of the train ? A. It was a severe, violent jolt. In other words, it stopped all sudden like it may have run into a brick building or something.
“Q. Have you ever before experienced such a jolt,on any previous trips or experience in tire mail service on this train. A.. I probably could give you two, cases. One time-we .run into-a passenger train on the SP and one .time the switch engine, run into our train in the yards, but that was the only times that I remember.”
At the time plaintiff was at work in this mail car, his superior, R. A. Sale, was working in the car as chief clerk, and he had charge of the car. His testimony was not taken to corroborate plaintiff’s statement that he suffered the accident, and plaintiff made.no outcry to Sale about the happening of the accident. After the accident is alleged to have happened, plaintiff continued his work and finished the trip on to Baton Rouge. He made no mention of the accident to Sale until on their return trip from Baton Rouge to Houston in the afternoon of the same day, when he said he had hurt his side. Plaintiff had been examined several days prior to the trial for the purpose of discovery by defendant, and ' there is some discrepancy given on his first examination and that given on the trial before the jury. He was asked if he remembered what he said in his deposition with reference to the suddenness and violence of the stopping of the train, and counsel for defendant indicated to him the purpose of questioning him about what he had previously stated, and these questions and answers are reflected by the record:
*561 “Q. Mr. Wooten, did you know the train was going to stop? A. No, I didn’t even know it was moving after it had come to a dead stop. (R. 64.)
ífc
“Q. Sir, I want to put you on your guard, didn’t you say in your- deposition that the train was moving so slowly . you didn’t know whether it was moving or not?
******
“A. The best I remember of what I said and what I intended to say, that the train had come to a complete stop the first time. I never felt it move, but the train must have been moving in order that they would apply the brakes to have such a jolt, but that is after it had started up after it had stopped.
“Q. You say it must have been moving? A. It couldn’t have stopped so suddenly if it was not -moving. (R, 84 & 85.)
* * * * sjt *
“Q. Will you state to the jury whether it (the accident) happened when you were starting or stopping? A. It would have to be when I was stopping because it would not be in applying the brakes if it wasn’t to stop and that is when I fell.” (R. 103.)
In view of this uncertain testimony, we are called upon to decide whether or not from plaintiff’s evidence and the other evidence in the record concerning the stopping or starting of the train, caused such a sudden jar, or jolt to produce the injury which plaintiff claims' it did. It is not every jar or jolt or violent jar or 'jolt in the operation of a train which makes a railroad company liable for negligence, because, under the law, it is not responsible for sudden stops, jars, jolts, lurchings or anything else that appears in the ordinary operation of the train. The passenger assumes the risk of encountering the ordinary happenings of stops, starts and jolts in the movements of trains. A train can hardly be operated unless there are some jolts or jars in stopping and starting.
The liability ’of a railroad company is predicated on unusual happenings which produce unusual and violent jars, j.olts and lurchings, in the operation of the train, which the persons in charge could have anticipated had they used proper, care before the .occurrence.
The true rule is stated in Vol. 13, -C.J.S., Carriers, § 7S0, page 1410:
'“It may constitute negligence that the train- or car is so operated that, by jerking or jarring, passengers are imperiled who are properly conducting themselves with- reference to -their transportation, and the conveyance must be operated with regard to the situation of the passengers as known to, or as it should be known- to, the -employees in- -charge. Thus it may constitute negligence to stop a train or car with such suddenness and violence as' to cause injury to a passenger, ■where there is no justification or excuse therefor. However, in order that the above rule may apply, the jerk or jolt must be urinecessary or unusually sudden or violent-; such jerks and jars as are necessarily incident to -the use of the conveyance, and are not the result of negligence, will not render the carrier liable for resulting injuries.”
See Masicot v. New Orleans Ry. & Light Co., 141 La. 622, 75 So. 490; Murphy v. New Orleans Public Service, La.App., 169 So. 890; Ritchie v. New Orleans Public Service, 15 La.App. 640, 132 So. 793; Nee v. New Orleans Public Service, 11 La.App. 1, 123 So. 135; Matthews v. New Orleans Public Service, Inc., 8 La.App. 463.
We also find in American Jurisprudence the general rule stated as follows: •
“The sudden jerking, jolting, or lurching of a vehicle used in the transportation of passengers has in many instances rendered, the carrier liable for the injuries thereby resulting to. a passenger. The question as to whether the motion of a vehicle at a particular time constitutes such negligence upon the part of the carrier as to permit re *562 covery against it by an injured passenger is a factual one, dependent upon the circumstances surrounding each case. The authorities are quite uniform in the view that no fixed rule can be propounded as to what jerking, lurching, or jolting of a conveyance will give rise to an inference of negligence in its operation or lay a sufficient basis upon which to predicate a finding of negligence in the carrier. Sudden jerks and jolts in the movement of. railroad trains or street cars are generally accepted as among the usual incidents of travel, which every passenger by experience has learned to expect to some extent. At precisely what point such violent movements lose their ■character as incidents reasonably to be expected during the course of travel and assume the status of actionable negligence is a question of fact, to be determined in the light of the surrounding circumstances. However, unusually sharp jerks of a vehicle or violent jolting due to a defect in the track or the negligent operation of the car has been frequently viewed as imposing liability upon the carrier for the resulting injuries to a passenger.” American Jurisprudence, Vol. 10, page 213, Section 1343.
Plaintiff produced no corroborating evidence to support the charge of the sudden and violent stopping of defendant’s train to produce the happening he complained about except his own uncorroborated statement. The employees of defendant, who were in charge of the train, and who were working on it at the time, all testified that they did not remember anything unusual happening on the trip. The records they made at the time show that no unusual starting or stopping happened at Port Barre on this particular trip. It is their evidence that if one had happened of any consequence, a record would have been made of it. Therefore, plaintiff’s uncorroborated testimony, as to the actual happening of an event producing the disability which he claims, is refuted by all of the other witnesses who had any opportunity to know whether anything unusual happened when Train No. 10 stopped at the water tank.
We know that it is common knowledge that a great number of people have potential hernias and have had them for years, and they are ignorant of their condition. They continue to work without discomfort although the work they perform is hard and laborious and hernias generally develop gradually and without the knowledge of the person. We also will notice that if a hernia is produced suddenly and by violence, or by lifting and straining, accompanied by a fall, it is immediately followed by pain and a feeling of weakness, sickness and incapacity for exertion. Straining and heavy lifting are the common causes for hernias, but severe coughing, sudden falls and any violent physical action or strenuous movement of the muscles of the abdomen terminate in a hernia. The thing we cannot understand about plaintiff’s evidence is that, assuming that he fell on the mail bag from the sudden jar or jolt received in the movement of the train, none of the immediate symptoms, according to the evidence, happened, and it was only after his rest period in the afternoon that plaintiff made a statement about his side being sore and the alleged accident.
The appellate courts of this state have said, in reference to an injury of the type alleged by plaintiff:
“It is common knowledge that many people have potential hernia for years and are ignorant of the fact. They continue, without discomfort, to perform their regular work, though it be heavy. They generally develop gradually and the condition enlarges im-perceptively and without the knowledge of the person. If a hernia is produced suddenly, it is almost invariably accompanied with pain and a burning sensation.” Donovan v. Standard Oil Co. of Louisiana, 197 So. 320, 326.
“It is a fact generally known that a traumatic hernia, produced by a sudden act, such as too heavy lifting and straining, accompanied by a fall, is *563 followed by immediate pain and a feeling of sickness and weakness with incapacity for exertion of any kind.” Marler v. Industrial Lumber Co., Inc., 155 So. 266, 268.
“It is shown and well known that hernias may be produced from many causes. Straining and heavy lifting are common causes, but severe coughing, sudden falls and any violent physical action or strenuous movement of the muscles of the abdomen also, sometimes, bring about conditions terminating in hernia.
“It is impossible to determine the age of a hernia from physical examination. When one suddenly arises, almost invariably it is accompanied by intense pain and considerable discomfort. It is unusual for a person who suddenly sustains a hernia to not make an outcry at the time, or otherwise acquaint those about him of the fact.” Capers v. Arkansas Natural Gas Corporation, 195 So. 618, 620.
It occurs to us that if the train had experienced the sudden violent stopping, as if it had run into another train, or knocked down the wall of a brick house, it not only would have injured plaintiff but the other occupant of that mail car and some of the passengers on that train would have had some knowledge that would at least have brought this matter to their attention or to the attention of the members of the train crew, or to plaintiff’s co-employee, R. A. Sale. Another point in the case which does not support plaintiff’s claim that he was injured is that he did not make any claim against the defendant until approximately six months after this accident is supposed to have occurred. The first information defendant had of any such claim being made, was when it received from plaintiff’s attorney a letter making demand. It was then too late for defendant to ascertain who were passengers on the train so proof could have been offered that no such unusual happening in the operation of the train occurred.
Another point which- weighs strongly against the plaintiff in this case is that he did not call R. A. Sale, his, co-employee, who was working with him in the mail car at the time, to support his claim for damages; neither did he call the two doctors who saw him a few days subsequent to the accident, and who could have given positive testimony that he actually had a hernia at the time they saw him, two or three days following the accident. It is a rule of evidence that a plaintiff who fails to call a witness who was present when a fact he expects to prove occurred and he does not call that witness, it is the presumption that the witness would have given testimony unfavorable to him. This rule is stated by the Supreme Court in the following cases:
“ * * * One of the fundamental rules of evidence is that a failure to call an available witness possessing peculiar knowledge concerning facts essential to a party’s case or to produce evidence of a more explicit, direct, and satisfactory character than that relied on by him, raises the inference or presumption that the testimony of the witness not called would not sustain his contention and that if more satisfactory evidence had been given it would prove detrimental in his cause. This is particularly true where no effort has been made to substantiate the statement of a witness whose credibility, although put in doubt, is susceptible of corroboration. King v. Atkins, 33 La.Ann. 1057; Crescent City Ice Co. v. Ermann, 36 La.Ann. 841; Pruyn v. Young, 51 La.Ann. 320, 25 So. 125; Nelson v. Vicksburg, S. & P. R. Co., 141 La. 475, 75 So. 212; Rubenstein v. Files, 146 La. 727, 84 So. 33; Toca v. Rojas, 152 La. 317, 318, 93 So. 108; Succession of Rageur, 155 La. 97, 98 So. 853; Perez v. Meraux, 201 La. 498, 9 So.2d 662; Stanley v. Jones, 201 La. 549, 9 So.2d 678; II Wigmore on Evidence (3rd Ed.) 162, Sections 285 and 286; 22 C.J. 115, § 56; 31 C.J.S., Evidence, § 156, subsec. c. page 856; 20 Am.Jur. 192, Section 187; and Ann.Cas.1914A, 915.”
*564 Bates v. Blitz, 205 La. 536, 17 So.2d 816, 820.
Since the plaintiff was the only'witness in the case to testify concerning; the sudden stopping of the train, and no other positive evidence except his testimony was given to sustain his claim for damages' ¿gainst the carrier, it is necessary 'to' scrutinize his testimony carefully and to study it in detail with the circumstances which tend to discredit it. Franklin v. Texas & P. R. Co., La.App., 35 So.2d 251. When we consider his testimony with the manner in which he said he carried the bag of mail, and not knowing whether he fell on the bag; of mail or the mail bag fell on him, no outcry being made to his fellow worker in the mail car and no claim being made against the carrier until approximately six months after the accident, it is just ,as probable that he stumbled under his load and fell without any unusual jar or jolt occurring in the operation of the train as it would be that he fell from a sudden jar or jolt of the train.
 The doctrine of res ipsa loquitur is not applicable to the facts in this case because the evidence does not show that the defendant was negligent or that there was á sudden stopping or jolting of the train to produce the injury complained of. It is true that a railroad owes to its passengers the highest degree of care, but it is not an insurer of its passengers; it is only required, in order to avoid liability, to show its freedom from; negligence by a preponderance of the testimony and is not required to go further and show how and why the plaintiff was injured. Brott v. Texas & Pac. Ry. Co., La.App,, 35 So.2d 801; Cusimano v. New Orleans Public Service, Inc., 170 La. 95, 127 So. 376.
Plaintiff has argued in this court that w.e .are not to reverse.a judgment of the trial court unless there is manifest error. It is true that the trial judge is a better judge of the credibility of the witnesses because he is acquainted with them and lives in their locality. It is also true that the trial judge and jury are confronted with local influences' and prejudices with which this court is not concerned. Under the Constitution and laws of this State, an appellant is entitled to -have, an appellate court not only pass on the law of his case, but also on the facts. If, in a proper analysis of the facts, an appellate court differs with the trial court or jury, it is its duty to reverse the trial court.
It is our view, from a thorough analysis of the evidence in-this case, that the plaintiff - has failed to prove a violent and sudden stop of defendant’s train to produce the hernia he claimed to have suffered. We also find under the • evidence that the defendant was not negligent in the operation of its train on the occasion in question and that whatever sudden jar or jolt plaintiff experienced on the occasion was assumed by plaintiff as a risk of ordinary jars or jolts incident to the stopping or starting of the train in the'usual manner.' Under the evidence in this case, the jury has rendered a sympathetic verdict, and it should be reversed and the suit dismissed.
For the reasons assigned, it is ordered, adjudged and decreed that the judgment of the District Court be set aside and reversed, and it is now ordered that plaintiff’s suit be dismissed with costs.