JANVIER, Judge.
This action ex delicto1 results from a collision between an automobile owned and operated by Samuel J. Fair and a diesel locomotive of New Orleans Terminal Company. As Fair, alone in his car and driving it in an uptown direction on North Prieur Street, attempted to cross tracks of the New Orleans Terminal Company, the car came into contact with the locomotive and sustained damage.
Fair had secured from American Fidelity Fire Insurance Company a policy of insurance in which the insurer had agreed that if the car should sustain damage in collision, he, the owner, would pay the first $100 of the cost of making the repairs and the insurer would pay the remainder of the costs. The repairs admittedly cost $569.74 of which the insurer paid $469.74, and, having obtained a -subrogation from Fair, brought this suit for $469.74. Fair did not present his claim in this or in any other suit.
The suit was brought against the Southern Railway Company and later, by supplemental petition, New Orleans Terminal Company, *821 incorrectly styled New Orleans Terminal Corporation, was made joint party defendant.
Plaintiff made certain charges of negligence against both railroad companies which we shall later discuss, and defendants denied any negligence on the part of the operators of the locomotive or otherwise, and in the .alternative especially averred that the accident had resulted from the contributory negligence of Fair. No point was made of the fact that New Orleans Terminal Company had been incorrectly styled as New Orleans Terminal Corporation.
From a judgment for $469.74 against both railroad companies, both have appealed.
There is no dispute over the amount of the award. It is conceded that if there is liability, the judgment for that amount is correct. Nor is there any controversy over which railroad is really involved, though it is shown that New Orleans Terminal Company was the owner of the locomotive and that it was being operated by its employees.
At that crossing there are two sets of railroad tracks, the first of which, consisting of five tracks, had already been crossed by Fair. After he had crossed those five tracks and had traversed an intervening space of slightly more than 20 feet, it was necessary that he cross a second set of tracks, the exact number of which is not shown but which tracks serve solely for the placing of freight cars to and from the various industries in that neighborhood. The first set of tracks, which Fair had traversed, had formerly been used for passenger trains which came into and went out of New Orleans from the old Terminal Passenger Station, which was located at the intersection of Basin and Canal Streets.
The record shows that at the intersection there had been erected signal lights which flashed as trains were approaching, but the record also shows that many years before this accident the use of those electric signal lights had been abandoned insofar as the second set of tracks was concerned. For years they had not been used to give warning of the approach of slow moving freight locomotives on that set of tracks.
It seems clear that the locomotive, which was approaching from Fair’s left, was on the second track of that second set of tracks, and it is the contention of plaintiff that, on the first of that second set of tracks, there were parked freight cars which were so close to the crossing that they obstructed his view of the approaching locomotive and that they also prevented his seeing the headlight of the locomotive which Fair himself concedes “was shining forward, towards the way the engine was moving. * * * It was shining down in front of the engine.”
It is also shown, without denial, that the bell on the locomotive was ringing and that the whistle had been blown several times very shortly before the locomotive reached the intersection.
Defendants maintain that the locomotive was moving slowly and that when it was a short distance from the crossing, the several employees in its cab saw the car approaching and called to the engineer, who was on the far side of the locomotive, warning him of the approach of the car; that the engineer immediately again sounded the whistle, applied the brakes and brought the locomotive to a stop just as its front end had almost crossed the intersection, and that the automobile crashed into the side of the locomotive near its front end.
There were five employees who testified on behalf of the defendant, and it is contended that not only did those who were in the cab interfere with the view of the engineer, but that they all told the same story with parrot-like repetition, which indicated that they all had been briefed as to what they were to say. All of the employees say positively that there were no boxcars parked on the intervening track which would have blocked the view of Fair and that they were sure of this because when they were more than 100 feet from the inter *822 section, they saw Fair’s car approaching the crossing.
There are several significant facts which are shown. In the first place, the accident occurred shortly after five o’clock in the morning after Fair, with a female friend, had been out together since eleven o’clock the night before. It is also shown that shortly after the occurrence, while the locomotive crew and Fair were waiting for the City Police, Fair got back into his car and went to sleep. He admits this, but insists that he had had only one drink — a beer — • about eleven o’clock on the evening before and that while he did get into his car and go to sleep, this was because the weather was cold and he knew that the police would be a long time in coming. The lady who had accompanied him on his all-night party did not appear to testify as to what they had had to drink, though he had left her at her residence only a few minutes before the accident. Certainly she would have known whether he had had only one drink during the entire six hours of the night. There were no witnesses except Fair himself and the several employees of the railroad and those employees, with one exception, stated that they had smelled liquor on Fair’s breath and that one, who did not say that he did smell liquor, merely said that he had not noticed such odor.
Another fact which we find interesting is that, although Fair was positive in his statements that the railroad company was entirely at fault, he made no effort in this litigation or otherwise, so far as the record shows, to recover the $100 which he himself had paid towards repairing his car.
Counsel for plaintiff argue with some logic that there is only one question involved and that is one of fact. They say that if there were no boxcars on the intervening track which blocked the view of Fair, obviously he was negligent, and that, therefore, since the Judge a quo rendered judgment in his favor, that Judge must have felt that Fair was not at fault and that his conclusions should not be interfered with unless found to be manifestly erroneous.
It is true that there have been many decisions to the effect that the finding of a trial court on a question of fact should' not be interfered with unless manifestly erroneous. Just what is manifestly erroneous is a very puzzling question. We-have given much thought to this question and have read many decisions and comments, notably the article of Judge Albert Tate, Jr., “Manifest Error”, Further observations on appellate review of facts in Louisiana civil cases, 22 Louisiana Law Review 605; and the article of Judge George W. Hardy, Jr., The Manifest Error Rule;. 21 Louisiana Law Review 749. We have-reached the conclusion that for a court to* find manifest error, it is not necessary to point to any particular fact or factor; but that since Courts of Appeal must consider questions of fact as well as questions of law, they may not reverse a trial court merely because the record leaves an “impression”' of error however strong that impression-may be. However, if an appellate court, after hearing the arguments and reading-the briefs and studying the record, finds that it cannot escape the conviction that there was error, there must be a reversal. Here we reach that conclusion.
In Hayes v. Viola d/b/a Famous Imported Autos & Trucks, La.App., 179 So.2d 685, handed down on November 2, 1965, we said:
“We are fully cognizant of the oft-repeated principle that great weight should be given to the findings of fact of the trial court, and except for manifest error, its findings should not be overturned. However, we agree with our brothers of the Second Circuit who dealt with this principle in Johnston v. Bearden, 127 So.2d 319, 326, 327 (La.App. 2d Cir. 1961), and said:
“ ‘Defendants contend that the trial court should not be reversed upon a finding of fact unless manifestly *823 erroneous. While it is true, where the issues presented are factual in nature, great weight should be accorded the conclusions and findings of the trial court, nevertheless, it is the constitutional duty of appellate •courts to consider questions of fact, .and appellants are entitled to the performance of that duty by the court. Pursuant to such constitutional duty, an appellate court should give consideration to questions of fact where presented as issues for determination and to exercise its judgment thereon. Brown v. Louisiana Ry. & Nav. Co., 147 La. 829, 86 So. 281; Esteve v. Continental Southern Lines, La.App. Orleans, 1955,83 So.2d 404, 408; Wooten v. Thompson, La.App. 1st Cir., 1953, 69 So.2d 557, 564.
“ ‘Where, in a proper analysis of -the facts, an appellate court differs with the trial court or jury, it is its duty to reverse the trial court. * * ’ ”
In Owens v. Felder, 35 So.2d 671, our predecessor, Court of Appeal, Parish of Orleans, discussed this question further, saying:
“We are reluctant to reverse the finding of a trial court based primarily on questions of fact, but in a case, such as we are presently analyzing, it is a self evident principle that it is occasionally easier to perceive fallacies and inconsistencies contained in the record by a comparison of the various portions of the transcribed record with other pertinent portions than it is to accurately observe and catalogue them while listening to the oral evidence of the various witnesses who testified during the course of the trial.”
See also Dickinson v. City of Minden, La.App., 130 So.2d 160.
We cannot escape the conviction that the record positively indicates that Fair himself was at fault and that the slightest care on his part could have avoided the accident. Though counsel for plaintiff referred to the statements of defendants’ witnesses as having been parrot-like repetitions, we find sufficient minor differences to justify giving those statements the stamp of veracity. They lead to the positive conclusion that the locomotive was clearly visible and that Fair could have known of its appearance had he been in the full possession of his faculties and on the alert. We couple this with the rather suspicious fact that he had been up all night, whether drinking or not, and that he went to sleep very soon after at the scene of the accident. All in all, we cannot avoid the conclusion that there was manifest error.
The judgment appealed from is reversed and plaintiff’s suit is dismissed at his cost.
Reversed.